IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CYTOLOGIX CORPORATION,

             Plaintiff,

    v.

VENTANA MEDICAL SYSTEMS, INC.,

             Defendant.

Civil Action No. 04-11783 (RWZ)

**CYTOLOGIX CORPORATION'S MEMORANDUM IN SUPPORT OF ITS COMBINED
MOTION FOR CLAIM CONSTRUCTION AND SUMMARY JUDGMENT OF
INFRINGEMENT**

Dated:  November 17, 2005

**FISH & RICHARDSON P.C.**
Michael E. Zeliger
Janet Lee (*pro hac vice*)
Fish & Richardson P.C.
225 Franklin Street
Boston, MA  02110-2804
Telephone:  (617) 542-5070
Facsimile:   (617) 542-8906

Attorneys for Plaintiff
CytoLogix Corporation

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II. BACKGROUND .............................................................................................. 2

    A.  The '261 Patent ........................................................................................ 2

III. ARGUMENT ................................................................................................... 4

    A.  Claim Construction Law ......................................................................... 4

    B.  Claim Construction Analysis .................................................................. 7

        1.  Claim Language ......................................................................... 8

        2.  Specification ............................................................................. 9

        3.  File History ............................................................................. 10

    C.  Infringement Law .................................................................................. 13

        1.  When There Are No Genuine Disputes of Material Fact, Summary Judgment Must Issue .................................................. 13

        2.  When an Accused Method Contains Each Limitation of a Patent Claim, It Infringes that Claim and Summary Judgment Must Follow .............................................................. 13

    D.  Infringement Analysis ........................................................................... 14

IV. CONCLUSION ............................................................................................... 19

i

# TABLE OF AUTHORITIES

**Cases**                                                                                                                 **Page(s)**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................................................13

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ................................................................................................13

*Comark Communications, Inc. v. Harris Corp.,*
156 F.3d 1182 (Fed. Cir. 1998) ..........................................................................6, 8

*In re Cruciferous Sprout Litig.,*
301 F.3d 1343 (Fed. Cir. 2002) ..............................................................................6

*CVI/Beta Ventures, Inc. v. Tura LP,*
112 F.3d 1146 (Fed. Cir. 1997) ..............................................................................5

*CytoLogix Corp. v. Ventana Medical Systems, Inc.,*
424 F.3d 1168 (Fed. Cir. 2005) ......................................................................1, 6, 8

*Ecolab Inc. v. Paraclipse, Inc.,*
285 F.3d 1362 (Fed. Cir. 2002) ..............................................................................8

*Franks Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.,*
389 F.3d 1370 (Fed. Cir. 2004) ............................................................................14

*Gemstar-TV Guide Int'l, Inc. v. ITC,*
383 F.3d 1352 (Fed. Cir. 2004) ..............................................................................6

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.,*
381 F.3d 1111, 1115 (Fed. Cir. 2004) ....................................................................5

*KCJ Corp. v. Kinetic Concepts, Inc.,*
223 F.3d 1351 (Fed. Cir. 2000) ..............................................................................4

*Kistler Instrumente AG v. United States,*
628 F.2d 1303 (1980) ..............................................................................................7

*Laitram Corp. v. Rexnord, Inc.,*
939 F.2d 1533 (Fed. Cir. 1991) ..............................................................................5

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
358 F.3d 898 (Fed. Cir. 2004) ............................................................................5, 6

*Markman v. Westview Instruments, Inc.,*
52 F.3d 967 (Fed. Cir. 1995) (*en banc*),
*aff'd*, 517 U.S. 370 (1996) ...............................................................................4, 14

*Nazomi Communications, Inc. v. ARM Holdings, PLC,*
403 F.3d 1364 (Fed. Cir. 2005) ..........................................................................6, 9

ii

*Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*,
984 F.2d 1182 (Fed. Cir. 1993)..................................................................................13

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)...........................................................................5, 6, 10

*Rexnord Corp. v. Laitram Corp.*,
274 F.3d 1336 (Fed. Cir. 2001)....................................................................................5

*Southwall Techs., Inc. v. Cardinal IG Co.*,
54 F.3d 1570 (Fed. Cir. 1995)....................................................................................14

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
775 F.2d 1107 (Fed. Cir. 1985).....................................................................................6

*Sunrace Roots Enterprise Co., Ltd. v. SRAM Corp.*,
336 F.3d 1298 (Fed. Cir. 2003).....................................................................................8

*Tanabe Seiyaku Co. Ltd. v. U.S. Int'l Trade Comm'n.*,
109 F.3d 726 (Fed. Cir. 1997).......................................................................................4

*TechSearch, L.L.C. v. Intel Corp.*,
286 F.3d 1360 (Fed. Cir. 2002).....................................................................................4

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002).....................................................................................6

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001).....................................................................................4

*Transonic Systems, Inc. v. Non-Invasive Medical Technologies Corp.*,
143 Fed. Appx. 320, 326 (Fed. Cir. 2005) (unpublished)...................................7

*United States v. Telectronics, Inc.*,
857 F.2d 778 (Fed. Cir. 1988).................................................................................7, 13

*Vitronics Corp., v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)...................................................................................4, 5

*Wenger Mfg. v. Coating Mach. Sys.*,
239 F.3d 1229 (Fed. Cir. 2001)...................................................................................14

iii

## I.    INTRODUCTION

This is a patent infringement case concerning technology for staining tissue samples in connection with the diagnosis of diseases such as cancer.  During the 1990s CytoLogix Corporation ("CytoLogix") developed ground breaking technology that improved the speed and efficiency of tissue staining.  In particular, CytoLogix was the first to develop an instrument that could independently heat and stain numerous slide samples simultaneously.  This invention dramatically improved the quality and efficiency of slide staining.  The key to this invention is that the instrument processes each slide sample according to its own needs.  To accomplish this, each sample must be heated independently and positioned such that it may be treated with reagents at appropriate times.  The United States Patent and Trademark Office awarded CytoLogix for its ingenuity with numerous patents, including United States Patent No. 6,541,261, the patent-in-suit (hereinafter "the '261 patent").  (Statement of Facts, ¶ 1.)

Ventana Medical Systems, Inc. ("Ventana") watched CytoLogix develop this technology and mimicked it.  Indeed, the Court may recall that a jury determined that Ventana's BenchMark instrument infringed numerous claims of two of CytoLogix' patents—a verdict that the Court of Appeals for the Federal Circuit has largely affirmed.[1]  CytoLogix's patents already found infringed, United States Patents 6,180,061 and 6,183,693, both contain limitations relating to the movement of slides to the liquid dispenser.  This is how the patent addresses the problem of positioning samples with respect to the liquid dispenser.  Ventana knew that it had an infringement problem with CytoLogix' patents.  It responded by making a minor change to its BenchMark instrument.  Ventana simply modified the BenchMark instrument such that the liquid dispenser moved to the slides, rather than the slides moving to the liquid dispenser.  The new instruments, called the BenchMark XT and BenchMark LT[2], are otherwise very similar to the original BenchMark instrument.  (Statement of Facts, ¶¶ 6, 7, 8.)  However, CytoLogix

---

[1] *See CytoLogix Corp. v. Ventana Medical Systems, Inc.*, 424 F.3d 1168 (Fed. Cir. 2005).

[2] The difference between the XT and LT products is simply their respective slide capacity. (Statement of Facts, ¶ 3 ("I don't believe that there's any other differences other than capacity.").)

subsequently obtained broader patent claims that cover "moving the platform and a liquid dispenser *relative to each other*" in the '261 patent. These claims cover movement by either the slides or the liquid dispenser or both. The key point was and remains that the instrument must be able to treat each slide sample separately. This includes the ability to independently heat each slide sample and align it with the liquid dispenser at the appropriate time. The patent refers to this latter feature as "random access." Random access allows any slide to be placed under the dispenser at any time. It is achieved whether the slides move to the liquid dispenser, or the liquid dispenser moves to the slides, or they move to each other.

This memorandum supports CytoLogix' motion for summary judgment of infringement. The threshold question in such an analysis is the meaning of disputed claim terms. However, it appears that the only significant claim construction dispute in this case is the meaning of the phrase "moving the platform and a liquid dispenser relative to each other."[3] If the Court agrees with CytoLogix that this limitation includes an instrument wherein a liquid dispenser rotates to the slides, then infringement cannot be disputed. Indeed, Ventana admits that every other claim limitation is present in the BenchMark XT and LT instruments. Accordingly, summary judgment of infringement is appropriate.

## II.    BACKGROUND

### A.    The '261 Patent

The '261 patent concerns automated instruments that replace manual slide staining techniques. (Statement of Facts, ¶ 9.) It is in the same family as CytoLogix's '693 patent, that Ventana has already infringed. (Statement of Facts, 10.) The '261 patent claims an improved slide staining method, which runs multiple procedures to numerous samples mounted on slides, concurrently. (Statement of Facts, ¶ 11.) Unlike slide stainers existing in the prior art, the invention claimed by the '261 patent allows for individual slides to be heated to different

---

[3] To the extent that there are any claim construction issues, CytoLogix will seek leave to address these in supplemental briefing if necessary. However, this is somewhat speculative, since Ventana has failed to provide its proposed claim construction, notwithstanding that CytoLogix served interrogatories seeking this information more than one year ago.

temperatures. (Statement of Facts, ¶ 12.) Specifically, the '261 patent discloses and claims a way "to heat slides to different temperatures, independently of the temperatures of other slides." (Statement of Facts, ¶ 13.) In addition, the invention allows for "complete random access, i.e., any reagent to any slide in any sequence." (Statement of Facts, ¶ 14.) Such "random access" is advantageous because it allows the instrument run different staining protocols on different samples, all at the same time.

As the '261 patent explains:

> Tissue sections or cellular monolayers are commonly examined by microscopic examination, for both research and clinical diagnostic purposes. Thin tissue sections or cellular preparations are commonly 1-10 microns thick, and are nearly transparent if untreated. In order to visualize various histologic features, a wide array of staining procedures have been developed over the years that highlight various cellular or extracellular components of the tissues. Histochemical stains, also commonly termed "special stains," employ chemical reactions to color various chemical moieties. Immunohistochemical stains employ antibodies as probes to color specific proteins, commonly via enzymatic deposition of a colored precipitate. ***Each of these histochemical and immunohistochemical stains requires the addition and removal of reagents in a defined sequence for specific time periods, at defined temperatures. Therefore, a need arises for a slide stainer that can perform a diversity of stains simultaneously under computer control, as specified by the technologist***.

(Statement of Facts, ¶ 15.) (Emphasis added.) To facilitate the automated "defined sequence for specific time periods, at defined temperatures" the instrument must be able to treat each slide sample according to its own needs. To that end, the instrument must be able to align any given slide sample with the liquid dispenser at a given time. It is immaterial whether the sample moves to the dispenser, or the dispenser moves to the slide, or they move to each other. In each case, the sample winds up under the liquid dispenser, which is all that is required.

The '261 patent has seven claims, six of which are dependent. Claims 1 and 2 are asserted in this case. (Statement of Facts, ¶ 16.) Claim 1 is an independent claim:

> 1. A method of processing samples mounted on microscope slides comprising:
>
> placing two or more microscope slides on a platform;

3

   providing heating elements being under independent electronic control,
and thereby capable of heating some slides to a different temperature than other
slides;

   moving the platform and a liquid dispenser relative to each other;

   dispensing liquid from the dispenser onto the slides;

and

   on the platform, heating one slide to a different temperature than a second
slide.

(Statement of Facts, ¶ 17.)

   Claim 2 is a dependent claim:

   A method of processing samples mounted on microscope slides as claimed in
claim 1, wherein each heating element heats only one slide.

(Statement of Facts, ¶ 18.)

   This brief, and indeed the entire case focuses on the meaning of "moving the platform
and a liquid dispenser relative to each other."

## III. ARGUMENT

   In deciding the question of patent infringement, the Court first determines the meaning of
the asserted claims and then compares the properly construed claims to the allegedly infringing
device. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001);
*see also KCJ Corp. v. Kinetic Concepts, Inc*., 223 F.3d 1351, 1355 (Fed. Cir. 2000). As the
patentee, CytoLogix bears the burden of proving infringement. *TechSearch, L.L.C. v. Intel
Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002).

### A. Claim Construction Law

   Claim construction is a question of law, and it is primarily accomplished by a review of
the patent itself, i.e. the claims and the specification, as well as the file history and cited
references. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*),
*aff'd*, 517 U.S. 370 (1996). Collective these sources are referred to as the "intrinsic record."
*Vitronics Corp., v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996). Extrinsic evidence
such as expert testimony, may also be considered as an inherent part of claim construction, but
only for background or confirmatory purposes. *Tanabe Seiyaku Co. Ltd. v. U.S. Int'l Trade*

*Comm'n.,* 109 F.3d 726, 732 (Fed. Cir. 1997).  Very recently, an *en banc* panel of the Federal

Circuit clarified the approach that should be taken with respect to the claim construction

analysis.  *See Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).

In *Phillips*, the Federal Circuit emphasized the significance of the language of the claims

themselves in claim construction: "It is a 'bedrock principle' of patent law that 'the claims of a

patent define the invention to which the patentee is entitled the right to exclude.'" *Id.* at 1312

(citing *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1115 (Fed. Cir.

2004); *see also Vitronics*, 90 F.3d at 1582 ("[W]e look to the words of the claims themselves . . .

to define the scope of the patented invention.").  Sometimes, looking at the plain meaning of the

claims is not only the beginning but also the end of the inquiry:

> In some cases, the ordinary meaning of claim language as understood by a person
> of skill in the art may be readily apparent even to lay judges, and claim
> construction in such cases involves little more than the application of the widely
> accepted meaning of commonly understood words.

*Phillips*, 415 F.3d at 1314.

As necessary, however, a court should consider other portions of the intrinsic record,

beginning with other claims:

> Other claims of the patent in question, both asserted and unasserted, can also be
> valuable sources of enlightenment as to the meaning of a claim term. . . .
> Because claim terms are normally used consistently throughout the patent, the
> usage of a term in one claim can often illuminate the meaning of the same term in
> other claims. . . . Differences among claims can also be a useful guide in
> understanding the meaning of particular claim terms. . . .  For example, the
> presence of a dependent claim that adds a particular limitation gives rise to a
> presumption that the limitation in question is not present in the independent claim.

*Phillips*, 415 F.3d at 1314-15  (citing *Vitronics*, 90 F.3d at 1582; *Rexnord Corp. v. Laitram*

*Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001); *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146,

1159 (Fed. Cir. 1997); *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991);

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)).  The Federal Circuit

reiterated this point in the earlier appeal concerning these same parties and the same patent

family: "An interpretation of one claim that renders another claim meaningless is disfavored."

5

*CytoLogix Corporation,* 424 at 1173 (citing *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1349 (Fed. Cir. 2002)).

Beyond the claims, the written description of the patent can be instructive.  However, *Phillips* cautioned against misconstruing a single example in the specification as a claim limitation:

> We also acknowledge that the purpose underlying the *Texas Digital* line of cases—to avoid the danger of reading limitations from the specification into the claim—is sound. Moreover, we recognize that the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice. . . . However, the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms. For instance, although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments. . . . In particular, ***we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment***. . . . That is not just because section 112 of the Patent Act requires that the claims themselves set forth the limits of the patent grant, but also because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments.

*Phillips*, 415 F.3d at 1323-24 (emphasis added) (citing *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998); *Nazomi Communications, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005); *Liebel-Flarsheim*, 358 F.3d at 906-08; *Teleflex, Inc. v. Ficosa N. Am. Corp*, 299 F.3d 1313, 1327 (Fed. Cir. 2002); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985); *Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1366 (Fed. Cir. 2004).

Next the Court considers the file history.  This is the dialogue between the patentee and the government that resulted in the issuance of the patent. It often illuminates the scope of the invention.  *Phillips.*, 415 F.3d at 1317 ("[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention . . . ."). During prosecution, a patentee may limit the scope of his or her claims by expressly disclaiming certain features.  *Id.* ("[T]he prosecution history can often inform the meaning of the claim

6

language by demonstrating . . . whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.").

However, the converse is also true. A patentee may increase claim scope by making broadening amendments, which remove or expand claim limitations. Federal Circuit case law precludes a construction that restricts a claim to limitations removed by a broadening amendment: "courts are not permitted to read 'back into the claims limitations which were originally there and were removed during prosecution of the application through the Patent Office.'" *United States v. Telectronics, Inc.*, 857 F.2d 778, 783 (Fed. Cir. 1988) (quoting *Kistler Instrumente AG v. United States*, 628 F.2d 1303, 1308 (1980)); *see also Kistler*, 628 F.2d at 1308 ("It is significant that none of the claims in the patent which ultimately issued contain the narrow limitation of original claim.... It must be concluded that the Patent Office did not feel that this was a critical limitation. Thus, defendant's insistence upon this court's reading back into the claims limitations which were originally there and were removed during prosecution of the application through the Patent Office cannot be permitted."); *Transonic Systems, Inc. v. Non-Invasive Medical Technologies Corp.*, 143 Fed. Appx. 320, 326 (Fed. Cir. 2005) (unpublished) (citing *Telectronics*, 857 F.2d at 783; *Kistler*, 628 F.2d at 1308) ("[T]his court's case law precludes a reading that restricts 'calculating' to the limitations removed by broadening amendment."). Thus, once allowed, such broadening amendments must be respected.

### B.    Claim Construction Analysis

As noted above, CytoLogix believes the following claim phrase requires construction:

"***moving the platform and a liquid dispenser relative to each other***"

CytoLogix proposes the following construction:

"There is relative movement between the platform and the liquid dispenser. Relative movement may be accomplished by moving the platform, or the liquid dispenser, or both."

CytoLogix anticipates that Ventana will propose the following construction:

"The platform must move to the liquid dispenser."

The Court should adopt the construction proposed by CytoLogix based on the plain language of the claim, as well as the intrinsic evidence.

### 1. Claim Language

The phrase "relative to each other" on its face means that movement between the slide platform and the dispenser is measured in reference to the each other. Ventana seeks to distort this language so that the claim requires the platform, and only the platform to move. Its interpretation essentially changes the claim language as follows: "moving the platform to ~~and~~ a liquid dispenser ~~relative to each other~~." Rewriting the claim this way is improper.

Moreover, Ventana's interpretation would render dependent claim 3 meaningless. This claim is not asserted, but does underscore the meaning of claim 1. It has a limitation that provides "wherein the platform is a moving platform." This clause is only meaningful if the platform in claim 1 need not move. Under CytoLogix's proper proposed construction, the platform may, but need not, move, whereas in Ventana's construction, only the platform may move. Ventana's construction thus conflicts with claim 3, which shows it is improper.

The doctrine of claim differentiation "create[s] a presumption that each claim in a patent has a different scope." *Comark Communications,* 156 F.3d at 1187. "That presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *Sunrace Roots Enterprise Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003) (citing *Ecolab Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1375 (Fed. Cir. 2002)). As the Federal Circuit has said, "Our court has made clear that when a patent claim 'does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement.'" *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1326 (Fed. Cir. 2003). And, as the Federal Circuit recently held, "An interpretation of one claim that renders another claim meaningless is disfavored." *CytoLogix Corporation*, 424 F.3d at 1173. Accordingly, Ventana may not read the

8

limitation that the platform must move into claim 1.  The plain meaning of "***moving*** *the platform and a liquid dispenser **relative to each other**"* is not so limited.

### 2.    Specification

The specification in the '261 patent is consistent with, and more importantly, does not contradict the plain meaning of the disputed phrase.  The specification explains the importance of indexing and independent slide heating:  "Since various procedures require heat at different times to enhance the rate of chemical reaction, a means has been developed to heat slides to different temperatures, independently of the temperatures of other slides."  (Statement of Facts, ¶ 19.)  The specification provides examples of these various procedures:

> Variables in these protocols can include the particular reagent used on the tissue sample, the time that the tissue sample is allowed to react with the reagent, whether the tissue sample is then heated, the rinse that is then used to wash the reagent away, followed by the subsequent removal of the rinse and reagent to allow subsequent exposure to a possibly different reagent.

(Statement of Facts, ¶ 20.)

A necessary component is that slides be aligned with the dispenser:

> It is possible to dispense from any of a plurality of cartridge pumps by rotating the reagent rotor so as to align a desired cartridge pump 46 with the hammer 26. This provides the capability of dispensing precisely measured amounts of reagent to any slide positioned underneath the cartridge pump 46 adjacent to actuator 26.

(Statement of Facts, ¶ 21.)

Two examples of achieving this alignment are described, wherein the slides rotate to the liquid dispenser, which in fact is an example of relative motion.  Moreover, the specification notes that the examples should not be considered exclusive:

> While this invention has been particularly shown and described with references to preferred embodiments thereof, it will be understood by those skilled in the art that various changes in form and details may be made therein without departing from the spirit and scope of the invention as defined by the appended claims.

(Statement of Facts, ¶ 22.)  Thus, nothing in the specification should be construed as a limitation. *See, e.g.*, *Nazomi Communications,* 403 F.3d at 1369 (explaining that claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification").

9

Accordingly, although a moving platform is the preferred embodiment, other methods of obtaining indexing are not precluded. It would be improper to construe the claims by importing in a limitation from the embodiments in the specification. *Phillips*, 415 F.3d at 1314-15 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments. . . . In particular, ***we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.***) (Emphasis added).

###  3.  File History

In addition to the claim language and patent specification, the prosecution history of the '261 patent supports CytoLogix's proposed construction.

The original claims in the application for the '261 patent referred to a "moving platform." (Statement of Facts, ¶ 23.) Throughout several amendments, the amended claims continued to refer to a "moving platform." (Statement of Facts, ¶ 24.)

However, following an interview with the patent examiner, the applicant voluntarily made a broadening amendment and removed the "moving platform" limitation from all claims. The following are "marked up" versions of these claims showing the changes:

> 1.    (Thrice Amended)  A method of processing samples mounted on microscope slides as claimed in claim 8 further comprising:
>               [placing two or more microscope slides on a moving platform, the moving platform having heating elements thereon to heat said slides;]
>               communicating data from a computer not located on the moving platform to electronic circuitry mounted on the moving platform; and
>               processing the data in the electronic circuitry on the moving platform and supplying from the electronic circuitry on the moving platform, amounts of electrical power to the heating elements dependent on the data, to heat one of the slides to a different temperature than a second one of the slides.

> 5.    (Twice Amended) A method of processing samples on microscope slides as claimed in claim 8 further comprising:
>               [positioning a plurality of microscope slides bearing biologic samples on a moving platform, said moving platform having a plurality of heating elements controllable to individual temperatures and electronic circuitry thereon;]

            providing a computer comprising a user interface through which a desired temperature for each microscope slide is specified, said user interface being mounted off of the moving platform;

            sending data from the computer to the electronic circuitry on the moving platform over a group of conductors, the number of conductors in said group of conductors being less than the number of heating elements controllable to individual temperatures; and

            processing the data in the electronic circuitry on the moving platform, and supplying electrical power to the heating elements from the electronic circuitry on the moving platform.

6. (Amended) A method of processing samples mounted on microscope slides comprising:
placing two or more microscope slides on a [moving] platform;
providing heating elements capable of heating said slides, said heating elements being
under independent electronic control and thereby capable of heating some slides to a different temperature than other slides; [and]
<u>moving the platform and a liquid dispenser relative to each other;</u>
<u>dispensing liquid from the dispenser onto the slides; and</u>
on the [moving] platform, heating one slide to a different temperature than a second slide.

8.      (Amended)  A method of processing samples mounted on microscope slides as claimed in claim 6, wherein the platform is a moving platform [is] capable of indexing slides adjacent to a stationary liquid dispensing location.

(Statement of Facts, ¶ 25.)  The inventors removed the bracketed text and added the underlined text.  Thus they replaced the "moving platform" with "relative" movement between the platform and the liquid dispenser.

     The applicant expressly noted this change to the to the examiner:

Amended independent claim 6 recites independent temperature control of slides in a system in which ***a liquid dispenser and a slide supporting platform are moved relative to each other in order to dispense liquid on the slide***.  None of the prior art, alone or in combination,  teaches such a system.

(Statement of Facts, ¶ 26.)  (Emphasis added.)

     The examiner read, understood, and accepted this amendment.  In fact, the examiner explained that the key to the invention was staining capability coupled with independent and individual slide temperature control:



(Statement of Facts, ¶ 27.)  This passage shows that the type of movement was simply not the basis for the examiner allowing these claims to issue.  Instead, it was the independent slide heating.

In fact, the examiner later explained his rationale—the inventiveness of "the capability of heating simultaneously to different temperatures"—in his "statement of reasons for allowance":

> Applicant's response filed 10-04-02 obviates the rejections set out in the last office action. The claims as now amended are directed to methods for processing samples which includes both dispensing of fluids onto moveable sample slides and simultaneously heating different sample slides to different temperatures. The response filed by applicant, including the submitted articles in support of the argument, are in the totality sufficient to establish that ***one of ordinary skill in the art viewing the apparatus of the '114 patent, would not have recognized any necessity nor desirability, absent applicant's disclosure, of providing the capability of heating simultaneously to different temperatures***.

(Statement of Facts, ¶ 28.)  (Emphasis added.)  Although the examiner referred to "moveable sample slides"[4] in passing, it is clear that the point of novelty is independent slide heating and control.

Taken as a whole, the file history is clear.  The applicants originally sought claims where the slide platform moved to the liquid dispenser.  However, the applicants then intentionally and expressly broadened the claims to cover relative movement between the platform and dispenser, meaning that either or both could move.  The examiner accepted this change and as explained

---

[4] Indeed referring to the platform as "moveable" in this context was appropriate, given that the movement had already been defined as relative to the liquid dispenser.

above, "courts are not permitted to read 'back into the claims limitations which were originally there and were removed during prosecution of the application through the Patent Office.'" *Telectronics,* 857 F.2d at 783.

Accordingly, the phrase "moving the platform and a liquid dispenser relative to each other" means, "there is relative movement between the platform and the liquid dispenser. Relative movement may be accomplished by moving the platform, or the liquid dispenser, or both."

The next step in the infringement analysis is applying the claim as construed to the accused method.

### C.    Infringement Law

#### 1.    When There Are No Genuine Disputes of Material Fact, Summary Judgment Must Issue

Summary-judgment provides a quick, just, and inexpensive way to resolve lawsuits and narrow issues for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Accordingly, summary judgment should be granted when the evidence, including pleadings, depositions, answers to interrogatories, and admissions on file, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(c). The substantive law governs which facts are material, and factual disputes are genuine only when a reasonable jury could return a verdict in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate in patent cases when the Rule 56(c) standards are satisfied. *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed. Cir. 1993).

#### 2.    When an Accused Method Contains Each Limitation of a Patent Claim, It Infringes that Claim and Summary Judgment Must Follow

The material facts for patent infringement are clear. Patent infringement lies against anyone who, without permission, makes, uses, sells, or offers for sale a patented product or process in the United States. 35 U.S.C. § 271(a). Resolving the infringement question is the

same for trial and summary judgment; it is a two-step inquiry. First, the Court must construe the asserted claims; second, the Court must determine whether the accused product contains each limitation of the construed claims. *Markman,* 52 F.3d at 977.

There is literal infringement when every claim limitation appears in the accused product. *See, e.g.*, *Franks Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). When an accused product practices the patent, infringement occurs and summary judgment shall issue. *Wenger Mfg. v. Coating Mach. Sys.*, 239 F.3d 1229, 1228, 1239 (Fed. Cir. 2001).

### D.    Infringement Analysis

The evidence in this case is crystal clear that every element in claim 1 of the '261 patent is present in both the BenchMark XT and BenchMark LT. CytoLogix took the deposition of Ventana pursuant to Federal Rule of Civil Procedure 30(b)(6) on September 8, 2005. During this deposition, Ventana's 30(b)(6) designee, Andrew Ghusson, admitted that all elements of claim 1 are present in Ventana's products. For ease of presentation, CytoLogix presents the evidence from this deposition in the following claim chart:

| Claim Limitation | Testimony re XT | Testimony re LT |
|---|---|---|
| 1. A method[5] of processing samples mounted on microscope slides comprising: | Q.  Does the Benchmark XT process samples mounted on microscope slides?  A.  Yes.  (Statement of Facts, ¶ 29) | Q.  Does the Benchmark LT process samples on microscope slides?  A.  Yes.  (Statement of Facts, ¶ 30) |

---

[5] Ventana has also admitted that it practices the method, i.e. it uses the Benchmark XT and Benchmark LT to stain slides. (Statement of Facts, ¶ 2.) ("Q.  Do folks at Ventana actually use a Benchmark LT to stain slides?  A.  Um, we use Benchmark LTs to stain slides, yes. Q.  Do you also use the Benchmark XT to stain slides?  A.  Yes.").

| | | |
|---|---|---|
| Placing two or more microscope slides on a platform; | Q.  Does the Benchmark XT hold two or more microscope slides on a platform?<br><br>A.  Uh, yes.<br><br>(Statement of Facts, ¶ 31) | Q.  Does the Benchmark LT hold two or more microscope slides on a platform?<br><br>A.  Yes.<br><br>(Statement of Facts, ¶ 32) |
| Providing heating elements being under independent electronic control, and thereby capable of heating some slides to a different temperature than other slides; | Q.  Does the Benchmark XT contain heating elements under independent electronic control that are capable of heating some slides to different temperatures than other slides?<br><br>A.  There is some independent electronic controls in the heater circuitry, but there's also some common electronic controls in the heater circuitry.  And the heater heating pads can be controlled to different temperatures, yes.<br><br>Q.  Such that slides can be heated to other temperatures than other slides?<br><br>A.  Within the context of the XT, yes.<br><br>(Statement of Facts, ¶¶ 33, 35) | Q.  Does the Benchmark XT contain heating elements under independent electronic control that are capable of heating some slides to different temperatures than other slides?<br><br>A.  There is some independent electronic controls in the heater circuitry, but there's also some common electronic controls in the heater circuitry.  And the heater heating pads can be controlled to different temperatures, yes.<br><br>Q.  Such that slides can be heated to other temperatures than other slides?<br><br>A.  Within the context of the XT, yes.<br><br>Q.  Is that also true of the LT?<br><br>A.  LT and XT have that in common, yes.<br><br>(Statement of Facts, ¶¶ 34, 36) |

| | | |
|---|---|---|
| moving the platform and a liquid dispenser relative to each other; | Q.  Does the liquid dispenser on the Benchmark XT move relative to the slide samples?<br><br>A.  Yes, it does.<br><br>(Statement of Facts, ¶ 37) | Q.  Does the liquid dispenser on the Benchmark LT move relative to the slide samples?<br><br>A.  Yes, it does.<br><br>(Statement of Facts, ¶ 38) |
| dispensing liquid from the dispenser onto the slides; | Q.  Does the Benchmark XT dispense liquid from the -- a dispenser onto the slides?<br><br>A.  Uh, yes, from what Ventana calls a dispenser, the disposable dispenser device.<br><br>(Statement of Facts, ¶ 39) | Q.  Does the Benchmark LT dispense liquid from the dispenser onto the slides?<br><br>A.  The XT and the LT have that in common, yes.<br><br>(Statement of Facts, ¶ 40) |
| and on the platform, heating one slide to a different temperature than a second slide. | Q.  Does the Benchmark XT heat one slide on a platform to a different temperature than another slide?<br><br>A.  Um, yes.<br><br>(Statement of Facts, ¶ 41) | Q.  Does the Benchmark LT heat one slide on the platform to a different temperature than another slide?<br><br>A.  Both instruments have that in common, yes.<br><br>(Statement of Facts, ¶ 42) |
| 2.  A method of processing samples mounted on microscope slides as claimed in claim 1, wherein each heating element heats only one slide. | Q.  In the Benchmark XT, does each heating element heat only one slide?<br><br>A.  One slide at a time, yes.<br><br>(Statement of Facts, ¶ 43) | Q.  And in the LT, likewise, does each heating element heat only one slide at a time?<br><br>A.  Yes.<br><br>(Statement of Facts, ¶ 44) |

In addition to these admissions by Ventana, the documentary evidence in this case, including operating, reference, and service manuals for the BenchMark instruments also shows that all elements in claims 1 and 2 of the '261 patent are present.  Again, for ease of presentation, CytoLogix presents this evidence in claim chart form:

| Claim Limitation | Documentary Evidence |
|---|---|
| 1.  A method of processing samples mounted on microscope slides comprising: | The "BenchMark® XT and BenchMark LT Operator Manual" states that "[t]he BenchMark XT and BenchMark LT instruments automate the IHC and ISH staining processes" and explains specifically that "[t]he BenchMark XT and BenchMark LT systems are intended to automatically stain histological or cytological specimens on microscope slides with specific immunohistochemical or *in situ* hybridization reagents." (Statement of Facts, ¶¶ 29, 30)<br><br>The "BenchMark$^{TM}$ XT/Discovery$^{TM}$ XT/BenchMark LT Service Manual" also explains that the accused products are used to process microscopic tissue samples: "The BenchMark XT/Discovery XT/Benchmark LT instrument automates an exacting and somewhat tedious laboratory procedure used to produce visible *stains* on biological tissue samples.  These stained tissue samples (on glass slides) are used by a pathologist to diagnose various diseases." (Statement of Facts, ¶¶ 29, 30) |
| placing two or more microscope slides on a platform; | The "BenchMarkTM XT/DiscoveryTM XT/BenchMark LT Service Manual" explains that "[t]he BenchMark XT and Discovery XT can hold up to 30 slides." (Statement of Facts, ¶¶ 31, 32)<br><br>This manual also includes a photograph that depicts multiple slides on a platform. (Statement of Facts, ¶¶ 31, 32) |
| providing heating elements being under independent electronic control, and thereby capable of heating some slides to a different temperature than other slides; | The "BenchMarkTM XT/DiscoveryTM XT/BenchMark LT Service Manual" explains that the accused products offer temperature control for individual slides: "Temperature is an important ingredient in the process.  Benchmark XT/Discovery XT/Benchmark LT has slide ThermoPads™ to control the temperature of individual slides so that the chemical reactions will occur under optimum conditions." (Statement of Facts, ¶¶ 33-36) |

17

| | |
|---|---|
| moving the platform and a liquid dispenser relative to each other; | The "BenchMark XT and BenchMark LT Operator Manual" shows how the platform (i.e., a slide tray) and liquid dispenser (i.e., the reagent carousel with dispensers stations) move relative to each other:<br><br>    "In essence, the reagent carousel rotates above the slide tray."<br>    "The first station encountered by a slide is the dual rinse nozzle."<br>    "The second station encountered by a slide is the jet drain."<br>(Statement of Facts, ¶¶ 37, 38)<br><br>Likewise, the "BenchMark® XT Reference Manual" shows that the liquid dispensers and carousel slide platform in the BenchMark products move relative to each other: "[r]eagent dispensers are positioned using a motor driven carousel." (Statement of Facts, ¶¶ 37, 38) ("When titration is required during the run, the instrument will pause and lower the slide tray.").)<br><br>This manual also refers to the movement of the carousel (i.e., the platform): "The carousel is able to rotate either clockwise or counterclockwise."<br>(Statement of Facts, ¶¶ 37, 38) |
| dispensing liquid from the dispenser onto the slides; and on the platform, | The "BenchMark® XT Reference Manual" explains that "[a] mechanical arm actuates a liquid dispenser positioned over a slide at precisely the right time."<br>(Statement of Facts, ¶¶ 39, 40) |
| heating one slide to a different temperature than a second slide. | The "BenchMark® XT Reference Manual" explains that "[e]ach slide position has a ThermoPad independently controlled by software and user protocols."<br>(Statement of Facts, ¶¶ 41, 42) |
| 2.  A method of processing samples mounted on microscope slides as claimed in claim 1, wherein each heating element heats only one slide. | The "BenchMark® XT Reference Manual" explains that "[e]ach slide position has a ThermoPad independently controlled by software and user protocols."<br>(Statement of Facts, ¶¶ 43, 44) |

This evidence, which comes exclusively from Ventana and cannot be disputed, shows that the BenchMark XT and LT practice every element of claims 1 and 2 of the '261 patent. Thus, summary judgment of infringement is warranted.

## IV.    CONCLUSION

For the reasons provided above, CytoLogix respectfully requests that the Court construe "moving the platform and a liquid dispenser relative to each other" to mean that "there is relative movement between the platform and the liquid dispenser.  Relative movement may be accomplished by moving the platform, or the liquid dispenser, or both."  CytoLogix further requests that the Court rule accordingly that use of Ventana's BenchMark XT and LT instruments is infringement of the '261 patent.

FISH & RICHARDSON P.C.

Date:   November 17, 2005              By:    /s/ Michael E. Zeliger
                                               Michael E. Zeliger (BBO # 633654)
                                               Janet Lee (*pro hac vice*)
                                               225 Franklin Street
                                               Boston, MA 02110-2804
                                               (617) 542-5070 Telephone
                                               (617) 542-8906 Facsimile

                                               Attorneys for Plaintiff
                                               CytoLogix Corporation

19

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of November, 2005, a true and correct copy of the

foregoing CYTOLOGIX CORPORATION'S MEMORANDUM IN SUPPORT OF ITS

COMBINED MOTION FOR CLAIM CONSTRUCTION AND SUMMARY JUDGMENT OF

INFRINGEMENT was caused to be served on the attorney at the following address as indicated:

**BY E-MAIL**
Roger J. Chin                                         *Attorneys for Defendant*
WILSON SONSINI GOODRICH & ROSATI    *Ventana Medical Systems, Inc.*
One Market
Spear Tower, Suite 3300
San Francisco, CA  94105

Ron E. Shulman
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA  94304

Michael S. D'Orsi
Peter E. Gelhaar
DONNELLY. CONROY & GELHAAR, LLP
One Beacon Street
Boston, MA  02108

/s/ Michael E. Zeliger
Michael E. Zeliger

21207990.doc