UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11783-RWZ

CYTOLOGIX CORPORATION

v.

VENTANA MEDICAL SYSTEMS, INC.

MEMORANDUM OF DECISION AND ORDER

October 17, 2007

ZOBEL, D.J.

## I.    Introduction

Defendant Ventana Medical Systems, Inc. ("Ventana") has moved to dismiss

plaintiff CytoLogix Corporation's ("CytoLogix") suit alleging infringement of two U.S.

Patents.  For the reasons discussed below, the motion is allowed.

## II.    Factual and Procedural Background

### A.    The Prior Litigation

In the late 1990s, CytoLogix and Ventana were competitors in the design,

manufacture, marketing and sale of instruments that automated slide staining

procedures in pathology laboratories.  In October 2000, CytoLogix brought suit against

Ventana, alleging misappropriation of trade secrets and confidential information, unfair

competition, violation of Mass. Gen. Laws ch. 93A and unjust enrichment.  It later

amended the complaint to add a Lanham Act claim and several antitrust claims under

15 U.S.C. § 2.

In early 2001, CytoLogix received two United States patents on aspects of its slide staining instrument.  It promptly filed a second lawsuit against Ventana, alleging infringement of both patents by Ventana's Discovery and Benchmark products.  This second suit was consolidated with the earlier suit (collectively, the "Prior Litigation") and the issues of liability for patent infringement and the trade secret violations were bifurcated from the issues of damages and antitrust.  After two jury trials, an appellate mandate by the Court of Appeals for the Federal Circuit and a decision on summary judgment by this court, Ventana was found liable only for non-willful infringement of CytoLogix's patents, with damages assessed at approximately $10.7 million.  Final judgment in the Prior Litigation was entered on September 18, 2007, in both cases.[1]

## B.    The Sale of CytoLogix's Assets to Dako

During the pendency of the Prior Litigation, on August 19, 2002, CytoLogix sold to DakoCytomation A/S ("Dako"), a Danish Corporation, all of its assets "used or usable primarily in connection with" its automated slide staining business.  (Purchase Agreement by and between DakoCytomation A/S and CytoLogix Corporation (Docket # 77, Ex. A.) ("Purchase Agreement"), 1-2.)  At the same time, CytoLogix purported to retain ownership of the Prior Litigation as well as all of its issued patents and pending patent applications.  A separate Patent Licensing Agreement ("Patent Agreement," collectively with the Purchase Agreement, the "Agreements") licensed to Dako the right to use the patents retained by CytoLogix.  (See Docket # 77, Ex. B.)

---

[1] Both parties have filed post-judgment motions in the Prior Litigation which are currently outstanding.

**C.    The Instant Litigation**

In response to the 2001 patent infringement suit, Ventana redesigned its instruments around the claimed features in the asserted patents.  The new instruments, the Benchmark XT/LT and the Discovery XT, were not part of the first litigation, although CytoLogix, in the context of the damages trial, disputed Ventana's contention that it had successfully designed around the Patents.

On April 1, 2003, the United States Patent and Trademark Office issued to CytoLogix a third patent, U.S. Patent No. 6,541,261 B1 ("the '261 Patent"), that covered certain aspects of its automated slide staining instrument.  On April 15, 2004, after the sale of its assets to Dako, CytoLogix filed a complaint against Ventana in the District of Delaware alleging that the Benchmark XT instrument infringed the '261 Patent. (Docket # 1.)   The suit was transferred to the District of Massachusetts in July 2004 and was ultimately assigned to this session on Ventana's motion in October 2004.  In early 2006, CytoLogix amended the complaint to add a claim that the Benchmark XT instrument infringed another patent, U. S. Patent No. 6,783,733 B2, issued on August 31, 2004.  (Docket # 52.)

After a hearing, the court issued an order on claim construction that, inter alia, denied CytoLogix's motion for summary judgment.  (Docket # 64.)  The matter is before me now on Ventana's motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) on the ground that CytoLogix lacks standing to bring suit for infringement of the patents, having relinquished all substantial rights to the patents by sale of its assets

to Dako.  (Docket # 73.)  CytoLogix opposes the motion.[2]

### III.    Legal Standard

#### A.    Standard for a Motion to Dismiss for Lack of Subject Matter Jurisdiction

A motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) is appropriate when the plaintiff lacks standing to bring the claim.  See Faibisch v. Univ. of Minnesota, 304 F.3d 797, 801 (8th Cir. 2002); Valentin v. Hospital Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001).  "Standing must be present at the time the suit is brought."  Sicom Sys., Ltd. v. Agilent Tech., Inc., 427 F.3d 971, 975-76 (Fed. Cir. 2005).  CytoLogix bears the burden of proving standing to bring this action.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

Where, as here, the challenge is to the sufficiency of plaintiff's standing on undisputed facts, the court accepts plaintiff's well-pleaded factual allegations as true, but may augment the pleadings with "an explanatory affidavit or other repository of uncontested facts."  Valentin, 254 F.3d at 364.  Therefore, the court considers, in addition to the pleadings, the Purchase Agreement and the Patent Agreement, copies of which both parties attached to their memoranda.

#### B.    Standing to Bring a Patent Infringement Suit

---

[2] After filing its motion to dismiss, Ventana filed a conditional motion for leave to amend its answer to add a defense of inequitable conduct should the motion to dismiss be denied.  (Docket # 83.)  Recently, CytoLogix filed a new motion for claim construction and summary judgment finding infringement.  (Docket # 91.)  Because the court concludes that plaintiff lacks standing to bring an infringement action on the patents-in-suit, these motions are denied as moot.

The patent monopoly granted by law "is one entire thing, and cannot be divided up into parts, except as authorized by those laws."[3] Crown Die & Tool Co.v. Nye Tool & Mach. Works, 261 U.S. 24, 37 (1923) (quoting Waterman v. Mackenzie, 138 U.S. 252, 255 (1891)).  It is well settled that only a patentee or his or her assigns has a right to sue infringers.[4]  See, e.g., Crown Die, 261 U.S. at 44; Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870, 874 (Fed. Cir. 1991); Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 1377 (Fed. Cir. 2000).  However, "[e]ven if the patentee does not transfer formal legal title, the patentee may effect a transfer of ownership for standing purposes if it conveys all substantial rights in the patent to the transferee." Propat Int'l. Corp. v. RPost, Inc., 473 F.3d 1187, 1189 (Fed. Cir. 2007); see also Aspex Eyewear, Inc. v. Miracle Optics, Inc., 434 F.3d 1336, 1340 (Fed. Cir. 2006).  "Whether a transfer constitutes a sale or license is determined by the substance of the transaction and a transfer will suffice as a sale if it appears from the agreement and surrounding circumstances that the parties intended that the patentee surrender all his substantial rights to the invention."  Vaupel, 944 F.2d at 874 (emphasis in original); see also Mentor H/S, Inc. v. Med. Device Alliance, Inc., 240 F.3d 1016, 1017 (Fed. Cir. 2001) ("To determine whether an agreement constitutes just an exclusive license or

---

[3] 35 U.S.C. § 281 provides that "[a] patentee shall have remedy by civil action for infringement of his patent."

[4] An exclusive licensee may have the right to sue for infringement if it joins the patent owner.  See Propat Int'l. Corp. v. RPost, Inc., 473 F.3d 1187, 1193 (Fed. Cir. 2007).  There is also an exception for extraordinary circumstances such as when the owner of the patent infringes the rights of an exclusive licensee.  See Ortho Pharm. Corp. v. Genetics Inst., 52 F.3d 1026, 1030 (Fed. Cir. 1995).

instead also transfers 'all substantial rights' in a patent, [the court] must ascertain the intention of the parties and examine the substance of what was granted by the agreement.").

## IV.    Discussion

CytoLogix argues that, while it transferred most of its assets to Dako, it retained ownership of the patents-in-suit and thereby retained standing to bring the instant case. Ventana asserts that Dako has acquired all substantial rights in the patents and is thus the only party with standing to sue for infringement.  To resolve this dispute, it is necessary to examine the terms of the Agreements.

### A.    The Terms of the Purchase Agreement

The "RECITALS" section of the Purchase Agreement lays out the structure of the asset sale to Dako.  In particular, it states that while CytoLogix ("Seller") wishes to sell and Dako ("Buyer") wishes to buy the automated staining business of Seller;

> CytoLogix wishes to retain all rights, interest and obligations related to the prosecution and settlement of, and all rights to legal and equitable relief, including, but not limited to, the recovery of damages, in the Ventana Litigation, and Buyer agrees that Seller shall retain all rights, interest and obligations related to the prosecution and settlement of, and all rights to legal and equitable relief, including, but not limited to, the recovery of damages, in the Ventana Litigation;

(Purchase Agreement, 1.)[5]  To that end, the Agreement further provides that:

> [D]uring the pendency of the Ventana Litigation, Seller shall retain all right, title and interest to all Seller's patents, except that Seller, as part of the sale of Purchased Assets, shall grant Buyer a license to use all Seller's patents pertaining to the Business, which patents shall be transferred by Seller to

---

[5] The "Ventana Litigation" is defined in the Purchase Agreement as the two cases filed in 2000 and 2001, described supra § II.A as the Prior Litigation.

Buyer for nominal consideration upon the first to occur of the Ventana Litigation having been finally settled or the exhaustion of all appeal rights and appeals relating to the Ventana Litigation.

(Id.)

The specifics of this partitioning of CytoLogix's instrument business from the Ventana Litigation are described in the substantive sections of the Purchase Agreement.  The assets to be retained by CytoLogix include, inter alia:

> . . . (a) any of Seller's rights in, arising out of or associated with, all United States, international and foreign patents (such rights pertaining to the Business being the "Patents") and applications therefore (including provisional applications) and all reissues, divisionals, renewals, extensions, provisionals, continuations and continuations in part thereof; (b) Seller's rights and interest relating to the prosecution and settlement of, and all rights to legal and equitable relief, including, but not limited to, recovery of damages in the Ventana Litigation; . . . .

(Id. at 4 ("1.02 Retained Assets.").)

CytoLogix agreed not to compete with Dako for three years from the date of the asset sale.  (See id. at 25 ("7.01 Nondisclosure; Non-competition").)  In addition, upon resolution of the Ventana Litigation, either by settlement or exhaustion of all appeal rights, CytoLogix "shall ten Business Days thereafter convey to Buyer for the consideration of US\$ 1 all of its right, title and interest in the intellectual property rights covered by, [the Patent Agreement]."  (Id. § 7.06.)

Thus, the Purchase Agreement contemplated a transfer of CytoLogix's entire automated slide staining business to Dako; however, it temporarily allowed CytoLogix to retain ownership of the Patents only to conclude the litigation with Ventana, at which time Dako would acquire full rights to all of CytoLogix's intellectual property.

B.      **The Terms of the Patent Agreement[6]**

The Patent Agreement delineates each party's rights to use and enforce the

intellectual property retained by CytoLogix (the "LICENSOR") during the pendency of

the Ventana Litigation.  Again, the "RECITALS" section explains the intent of the

parties in structuring the Agreement:

> Due to the fact that LICENSOR is currently engaged in certain litigation, referred to in the above mentioned [purchase] agreement as the "Ventana Litigation", involving a dispute over certain patent rights on which the Business is based, LICENSOR and LICENSEE [Dako] have agreed that during the pendency of this litigation, LICENSOR shall retain full right, title and interest to these patent rights, except that LICENSOR shall grant LICENSEE a license to exploit the said patent rights on the terms set forth;
>
> LICENSOR and LICENSEE have further agreed that LICENSOR shall convey the above-mentioned patent rights to LICENSEE once the Ventana Litigation has finally been settled on the terms and conditions set out below.

(Patent Agreement, 3.)

The Patent Agreement grants Dako an "irrevokable world-wide, royalty-free

license through out the License Term[7] to exploit the Patents for any purposes the

LICENSEE deems appropriate . . . ."  (Id. § 4.1.)  This grant purports to be non-

exclusive; however, CytoLogix "may not grant any licenses for the exploitation of the

---

[6] Although the agreement is styled as a "Patent Licensing Agreement," the title of the agreement is not germane to the issue of CytoLogix's standing to sue.  It is the terms of the agreement that determine whether it is an assignment or a license of CytoLogix's intellectual property rights to Dako.  See Aspex Eyewear, 434 F.3d at 1340 ("Whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions." (quoting Waterman, 138 U.S. at 256)).

[7] The License Term began when the asset sale closed and "expires automatically upon the date of final resolution between LICENSOR and Ventana Medical Systems, Inc."  (Patent Agreement § 13.1.)

Patents in any manner without the prior written consent of the LICENSEE." (Id. § 4.2.) The only exception allows CytoLogix to grant a "non-exclusive, non-transferable and non sub-licensable license" to Ventana without Dako's consent, but requires that "LICENSOR shall inform LICENSEE promptly" should such a license be granted. (Id.) Any new inventions or improvements to the Patents made by CytoLogix during the term of the Agreement must be reported to Dako so that it may "assess whether commercial exploitation thereof should be commenced and/or if a patent application should be filed." (Id. § 4..) In addition, CytoLogix may not "transfer, encumber or alienate the Patents in any manner whatsoever" without Dako's permission. (Id. § 4.4.) Dako has the right to sub-license the patents to any third parties, except Ventana, without prior approval from CytoLogix, although it must notify CytoLogix of any sub-license. (Id. § 5.1.)

Dako has the right, but not the obligation, to pursue infringement or suspected infringement of the Patents, but it must notify CytoLogix of any litigation and cannot interfere with the Ventana Litigation. (Id. § 7.1.) In addition, CytoLogix must notify Dako of any infringement or suspected infringement of which it becomes aware. (Id. § 7.2.) If Dako chooses not to pursue a potential infringer, then CytoLogix has the right to pursue the case at its own expense. (Id. § 7.3.) The party that pursues the infringement action is entitled to the full recovery of any damages awarded as a result of the action. (Id. § 7.4.)

If a question of the validity of the Patents or a claim that exploitation of the Patents infringes the intellectual property of another arises, Dako has the right to take

over the litigation at its own expense.  (Id. § 7.5.)  If Dako cannot or chooses not to defend the patent, CytoLogix must "continue to handle the defence to the best of its efforts," although Dako must pay all legal costs including lawyers' fees.  (Id. § 7.6.)  In that event, Dako has the right to choose CytoLogix's legal counsel and "LICENSOR shall inform LICENSEE closely on the development of such action and copy-in LICENSEE on any in-going and out-going correspondence in the matter."  (Id.) CytoLogix cannot settle or otherwise consent to a disposition of any legal proceedings concerning the validity of the patent without the prior written consent of Dako.  (Id. § 7.7.)

While CytoLogix is responsible for the prosecution and maintenance of the Patents, Dako must reimburse all its costs and CytoLogix may not let any patent lapse without Dako's consent.  (Id. §§ 8.1, 8.3.)  CytoLogix is obligated to copy Dako on "any and all correspondence between LICENSOR and patent authorities, patent attorneys, patent agents and others related to the Patents and related applications."  (Id. § 8.2.) In addition, Dako may replace CytoLogix's patent counsel with one of its own choosing and "shall be entitled to instruct LICENSOR, patent agents and others with respect to the maintenance and prosecution of the Patents and related applications," with the exception that Dako may not interfere with the Ventana Litigation.  (Id. § 8.5.)

Finally, Dako may terminate the Patent Agreement unilaterally with thirty days notice, while CytoLogix has no corresponding right to terminate.  (Id. § 13.2.)

**C.    The Allocation of Substantial Rights**

The combined effect of the Purchase Agreement and the Patent Agreement is

that Dako has: (1) an irrevocable right to make, use and sell products covered by the Patents; (2) the right to license the Patents to third parties (other than Ventana); (3) the right to commence legal action against third parties for infringement of the Patents; (4) the right to notice of any infringement discovered by CytoLogix; (5) the right to take over any litigation implicating the validity of the Patents and the power to approve or veto settlement of any such litigation brought by CytoLogix; (6) the right to control maintenance and prosecutions of the Patents and patent applications; (7) the right to choose and replace patent counsel; (8) the right to receive copies of all correspondence between CytoLogix and the Patent Office and/or patent counsel; (9) the right to terminate the Patent Agreement with thirty days notice; (10) the obligation to pay for the costs to defend the validity of the Patents; (11) the obligation to pay all costs of maintenance and prosecution of the Patents; and (12) the right to an automatic assignment of the Patents on conclusion of the Prior Litigation.

CytoLogix retains: (1) the right to pursue the Ventana Litigation; (2) the right to license the Patents to Ventana; (2) the right to notice of licenses granted by Dako; (3) the right to pursue infringers of the Patents if Dako chooses not to pursue them; (4) the obligation to litigate challenges to the validity of the Patents if Dako chooses not to pursue such challenges, but Dako must pay for the litigation, may choose counsel and controls settlement; and (5) the obligation to maintain the Patents under Dako's direction and funding.

Dako's control of and payment for patent maintenance and prosecution, along with its right to choose patent counsel, result in no more than agency status for

11

CytoLogix. Similarly, Dako's control over CytoLogix's legal counsel in challenges to the validity of the Patents, its right to all correspondence in any such challenge and its control over settlement, as well as its obligation to pay for the litigation costs, makes CytoLogix's participation illusory. Thus, under the terms of the Agreements, CytoLogix has no substantial rights in patent prosecution and maintenance or in defending the Patents against validity challenges.

### D.    The Adequacy of CytoLogix's Retained Rights

The issue, then, is whether CytoLogix's remaining rights, including the right to notice of Dako's licensees, the right to pursue infringers if Dako chooses not to and the right to license the Patents to Ventana are adequate to maintain its status as owner of the Patents and allow it to bring suit for infringement. See Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 1378 (Fed. Cir. 2000) ("[To] ascertain the intention of the parties and examine the substance of what was granted . . . it is helpful to look at what rights were retained by the grantor.").

### 1.    The Relevance of Aspex Eyewear

CytoLogix relies on the Federal Circuit's decision in Aspex Eyewear, Inc. v. Miracle Optics, Inc., 434 F.3d 1336 (Fed. Cir. 2006), to support its claim that it retains ownership of the Patents. In Aspex Eyewear, Contour Optik, Inc. ("Contour") executed an agreement with Chic Optical, Inc. ("Chic") to grant Chic a number of rights in a patent owned by Contour. Chic obtained (1) the exclusive right to "make, use, and sell in the United States products covered by the patent;" (2) the first right to sue alleged infringers and the right to any damages which result from its suit; and (3) the right to

sublicense all of its rights to a third party. Id. at 1338. Contour retained the right to

bring an infringement action if Chic chose not to do so, and the (apparently unilateral)

right to contribute up to half of the litigation expenses of any infringement suit in return

for a pro rata share of any damages award. Id. However, unlike the instant case,

these rights were guaranteed to terminate on a future date:

> Most significantly, for purposes of this appeal, the agreement also contained
> a clause providing that the agreement would expire on March 6, 2003, and
> in no event later than March 16, 2006, if Chic exercised its one option to
> extend, after which all of the rights under the '747 patent that the agreement
> initially granted to Chic would terminate.

Id. On this basis, the appellate court reversed the lower court's finding that Contour did

not posses the "rights of the patentee" because "it had already transferred to Chic all

substantial ownership interests" in the patent at the time the original complaint was

filed. Id. at 1339. While the Federal Circuit noted that the exclusive right to practice

the patent, the right to sue for infringement and the right to sublicense "strongly favor a

finding of assignment," it found the provision limiting the term of the license to be

controlling:

> However, the dominant factor in the Contour/Chic agreement on which we
> differ with the district court's otherwise well-reasoned opinion is the provision
> limiting the term of the license. . . . As of March 16, 2006, Contour, absent
> an amendment of the agreement, will regain all of the rights under the '747
> patent that it had previously transferred to Chic. It is thus the unquestioned
> owner of the patent, and, whatever rights Chic had up until 2006, it is clear
> that Chic never had all substantial rights to the patent, i.e., it never was the
> effective owner of the patent.

Id. at 1342.

The court justified this result by noting the public policy "in favor of preventing

multiple lawsuits on the same patent against the same accused infringer." Id. at 1343.

A holding that Chic had been assigned the patent would mean that it could bring an

infringement action without joining Contour.  Then, when patent ownership reverted to

Contour, it could the bring the same claim against the same accused infringer.  Id.  The

Federal Circuit also cited the policy limiting a party with lesser rights from bringing a

lawsuit that could jeopardize the validity of the patent without the participation of the

patent owner "who would own the patent rights for a much longer period of time."  Id.

In the instant case, however, the situation is reversed.  Upon resolution of the

Ventana Litigation, all rights in the purportedly licensed intellectual property are

transferred to Dako.  Unlike the situation in Aspex Eyewear, here the risk of multiple

lawsuits exists only if Cytologix is found to be the owner of the Patents.  In addition,

Dako is the holder of the greater rights with respect to validity because it has rights to

control any action threatening the validity of the Patents and veto rights over any

settlement.  Thus, application of the Aspex Eyewear rationale leads to the conclusion

that Dako is the owner of the Patents.

### 2.    CytoLogix's Right to Sue for Infringement

The Federal Circuit noted in Aspex Eyewear that a "key factor" in determining

who owns the patent "has often been where the right to sue for infringement lies."  Id. at

1342.  Here, CytoLogix's litigation rights are subordinate to Dako's.  CytoLogix must

inform Dako of any suspected infringement of the Patents or of any threat to their

validity, and Dako has the first right to litigate or not.  If it does choose to bring suit, it is

entitled to the full recovery of all damages awarded.  Only if Dako chooses not to

pursue a case may CytoLogix bring the suit in its name.  Even then, if the action

implicates the validity of the Patents or claims infringement of a third-party's intellectual

property, Dako has the right to either take over the defense or to choose CytoLogix's

legal counsel and be "closely" informed on the development of the action.[8]  (Patent

Agreement §§ 7.5, 7.6.)  Moreover, Dako can defeat any CytoLogix suit, except one

against Ventana, by choosing to license to the defendant without CytoLogix's consent.

Cf. Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1251 (Fed. Cir. 2000) (grantor's right

to sue if grantee chooses not to was not dispositive on the issue of retention of

substantial rights where, inter alia, grantee could freely license to any party sued by

grantor).  By contrast, Dako's only obligation to CytoLogix is to inform it of its intention

to sue and to pay for CytoLogix's defense of the Patents.

This allocation of rights again weighs in favor of Ventana's claim that CytoLogix

has assigned the Patents to Dako.[9]  See Intellectual Prop. Dev., Inc. v. TCI Cablevision

---

[8] This appears to guarantee Dako significant involvement in most infringement suits, since a defense of invalidity appears in almost every answer to a claim of infringement.

[9] CytoLogix's reliance on Grantham v. Mcgraw-Edison Co., 444 F.2d 210 (7th Cir. 1971), overruled en banc on other grounds by Otis v. City of Chicago, 29 F.3d 1159 (7th Cir. 1994), is misplaced.  In Grantham, the court found that a grantor who reserved a royalty interest in his invention had not assigned the patent to the grantee. The court explained that "[a]ny different conclusion would leave a patentee who grants an exclusive license but reserves a royalty interest in his invention at the mercy of his licensee" because he would have no "effective remedy if his licensee failed to prosecute infringers." Id. at 216.  Here, Dako has a "world-wide, royalty-free license" to exploit the patents, so there is no royalty stream that would be affected by Dako's failure to prosecute infringement.  (Patent Agreement § 4.1.)  CytoLogix's only retained pecuniary interest in the Patents is recovery of infringement damages through litigation against Ventana or against other third parties Dako permits it to pursue.

of Cal., Inc., 248 F.3d 1333, 1344 (Fed. Cir. 2001) ("The right to sue in Vaupel, which

was deemed 'particularly dispositive,' was only subject to an obligation to inform the

transferor of any impending litigation.  944 F.2d at 875, 20 USPQ2d at 1049.").

### 3.    Cytologix's Right to Notification of Dako's Actions

CytoLogix's right to notification of Dako's licensees, lacking any veto power over

those licenses, is not a substantial right.  Notification is a necessary adjunct to

CytoLogix's right to sue for infringement of the patents in those cases where Dako

chooses not to sue.  Without a list of Dako's licensees, CytoLogix would have no way

of knowing which companies practicing the inventions were legitimate licensees and

which were infringing the Patents.  Similarly, the requirement that Dako notify

CytoLogix of any planned or actual litigation does not confer a substantial right; it is

necessary to effect the terms of the agreement allocating the privilege to sue for

infringement.

### 4.    CytoLogix's Right to License the Patents

The only substantial right of an assignee which Dako appears to be lacking is

"the exclusive right to make, use, and vend" the patented invention.  Aspex Eyewear,

434 F.3d at 1342 (quoting Waterman, 138 U.S. at 256) (emphasis added).  This is

because the Patent Agreement gives CytoLogix the right to grant a "non-exclusive,

non-transferable and non sub-licensable license" to Ventana without Dako's consent.[10]

_____

[10] In addition, CytoLogix argues that Dako has a non-exclusive license because, after the expiration of the three-year non-compete period, it also has a right to practice the patented technology. This argument is unpersuasive.  First, on the date the instant complaint was filed, the non-competition clause of the Purchase Agreement prohibited CytoLogix from engaging in the business activity covered by the Patents.  Second,

(Patent Agreement § 4.2.)  The limited right to potentially license the opposing party in settlement of an existing (at the time of the asset sale), retained lawsuit is "a minor derogation from the grant of rights."  Vaupel, 944 F.2d at 875 (finding the retention by the grantor of a right to veto sublicensees did not "substantially interfere with the full use by [the grantee] of the exclusive rights under the patent").  This is particularly true where the stated intent of the parties was to sever the Ventana Litigation from all other substantial rights of patent ownership.  See id. at 874 ("[A] transfer will suffice as a sale if it appears from the agreement and surrounding circumstances that the parties intended that the patentee surrender all his substantial rights to the invention.").

While CytoLogix purportedly has the right to license the Patents to third parties other than Ventana, any such licenses require Dako's permission.  (Patent Agreement § 4.2.)  This effectively gives Dako, not CytoLogix, control of all other third-party licenses.

### E.    All Substantial Rights Are Assigned to Dako

The intent of the parties, as reflected in the Agreements, was to sell CytoLogix's automated staining business to Dako while allowing CytoLogix "to retain all rights . . . in the Ventana Litigation."  (Purchase Agreement at 1.)  Thus, the Agreements separate

_____

even after the expiration of the non-compete, this right is illusory because it is extinguished as soon as the Prior Litigation is resolved and Dako is assigned legal title to the patents, as required by the Purchase Agreement.  CytoLogix would not invest in the design, tooling, manufacturing capability and sales and marketing organization to sell a product that it could, at any time, lose the right to make.  See Prima Tek II, 222 F.3d at 1378 ("To determine whether a license agreement has conveyed all substantial rights in a patent, and is thus tantamount to an assignment, we must ascertain the intention of the parties . . . .").

the right to sue from the right to practice the invention, and CytoLogix's resulting rights

are limited to the former.

Given the intent of the parties and the allocation of rights, the "license

agreement has conveyed [to Dako] all substantial rights in [the Patents], and is thus

tantamount to an assignment." Prima Tek II, 222 F.3d at 1378.  Dako controls and

pays for maintenance of the Patents, with CytoLogix acting as no more than its agent,

an indication of its ownership of the Patents.  See Propat, 473 F.3d at 1191.  Dako has

the power to grant general licenses to the Patents and has made no promises to

CytoLogix that "others shall be excluded from practicing the invention."  Rite-Hite Corp.

v. Kelley Co., Inc., 56 F.3d 1538, 1552 (Fed. Cir. 1995) (en banc) (noting that a party

that has not received "an express or implied promise of exclusivity" has received only a

"bare license" and has "no right to sue for infringement at law in the licensee's own

name").  Conversely, other than settling with Ventana, CytoLogix has no right to license

the Patents or to forgive infringement of the Patents, the basic rights that define patent

ownership.  See Prima Tek II, 222 F.3d at 1379 ("A patent represents the legal right to

exclude others from making, using, selling, or offering to sell a patented invention . . . .

Implicit in the right to exclude is the ability to waive that right, i.e., to license activities

that would otherwise be excluded . . . .").  CytoLogix receives no income or royalties

from the practice of the Patents by Dako or its licensees.  Cf. Propat, 473 F.3d at 1191

(finding ownership where grantor "retain[ed] an economic interest in the patent and a

substantial measure of control over decisions affecting the patent rights").  Finally, legal

title to all of the Patents will unequivocally transfer to Dako within ten days after the

conclusion of the Prior Litigation.

In sum, CytoLogix, no matter what the terminology of the agreements, has no more rights than a non-exclusive licensee, and then only for the term of the Ventana Litigation. See Waterman, 138 U.S. at 256 ("Whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions."). Therefore, CytoLogix lacks standing to bring the instant suit.[11] Cf. Ortho Pharm. Corp. v. Genetics Inst., Inc., 52 F.3d 1026, 1031 (Fed. Cir. 1995) ("A holder of [] a nonexclusive license suffers no legal injury from infringement and, thus, has no standing to bring suit or even join in a suit with the patentee.").

## V.    Conclusion

Accordingly, Ventana's motion to dismiss for lack of jurisdiction (Docket # 73) is ALLOWED.  Ventana's assented-to motion to seal documents previously lodged with the court (Docket # 84) is ALLOWED.  All other outstanding motions (Docket ## 83, 88, 91, 92, 96) are DENIED as moot.

Judgment may be entered dismissing the complaint.

---

[11] This result is also in keeping with the policy concerns motivating the jurisprudence on standing to bring a patent infringement suit, i.e., the avoidance of multiple lawsuits against the same defendant for the same infringement. See, e.g., Indep. Wireless Tel. Co. v. Radio Corp. of America, 269 U.S. 459, 468 (1926); Aspex Eyewear, 434 F.3d at 1343; Ortho Pharm. Corp. v. Genetics Inst., Inc., 52 F.3d 1026, 1031 (Fed. Cir. 1995); Evident Corp. v. Church & Dwight Co., Inc., 399 F.3d 1310, 1314 (Fed. Cir. 2005).

|                          |                                   |
| ------------------------ | --------------------------------- |
| October 17, 2007         | /s/Rya W. Zobel                   |
| DATE                     | RYA W. ZOBEL                       |
|                          | UNITED STATES DISTRICT JUDGE      |